THE STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. RALPH CARBONE AND LORETTA FRANZE, DEFENDANTS-APPELLANTS.

Argued September 8, 1952—Decided October 14, 1952.

332

*Mr. George R. Sommer* argued the cause for appellants (*Mr. Pearce R. Franklin* of counsel with appellant Loretta Franze).

*Mr. Edward Gaulkin,* Essex County Prosecutor, argued the cause for the State (*Mr. C. William Caruso* on the brief).

The opinion of the court was delivered by

HEHER, J. After affirmance by the Appellate Division of the Superior Court, we certified for appeal a judgment of conviction entered on a jury verdict against appellants Carbone and Franze upon the trial of an indictment charging that on June 26, 1950, "and continuing to and including July 22, 1950," at the City of East Orange, New Jersey, Carbone and Franze and "John Doe," whose true name was unknown, conspired to transgress the laws of the State denouncing bookmaking on horse races. There was, it is said, a severance as to the person described by the fictitious name.

The indictment alleges these overt acts to effect the object of the pleaded conspiracy: On June 26, 1950, "John Doe" introduced one John Kammerer to Carbone "for the purpose of having" Carbone "establish" Kammerer in "a place" in East Orange "for the unlawful making and taking of what is commonly known as a book upon" horse races; and Carbone thereupon introduced Kammerer to Franze "for the purpose of having" Kammerer "make and take * * * a book upon" horse races "in the premises known as No. 106 North Grove Street, in East Orange." On the day given, and on divers other days thereafter until July 22, 1950, Franze "permitted" Kammerer "to enter the premises" 106 Grove Street, in East Orange, "for the purpose of making and taking * * * a book on" horse races. On June 28, 1950, at East Orange, "John Doe" received the sum of $150 from Kammerer, "as a rental for the use of the premises" named for the stated unlawful purpose; and on July 1, 1950, and again on July 16 ensuing, "John Doe" received the sum of $300 from Kammerer, in each instance "as a rental for the use of the premises" for the same unlawful purpose.

There was evidence tending to show the illegal combination charged, the commission of the overt acts specified and other such acts in the advancement of the undertaking, and Kammerer's participation in the conspiratorial design.

Briefly, in the latter part of June, 1950, at the City of New York, Kammerer was introduced to a man known to him only as "Murray" by one Kalik, a known bookmaker then plying his trade in that city. "Murray" is referred to in the indictment by the fictitious name. Kalik told Kammerer: "Go with Murray to Jersey and he will get a phone for you." This for the purpose of bookmaking on horse races. Kammerer accompanied Murray to a drug store on Main Street in East Orange, New Jersey. Murray entered the drug store and soon returned with a man identified as the defendant Carbone, whom he introduced to Kammerer. In response to Carbone's inquiry, Kammerer said he was ready for business and needed "only a scratch sheet, a pencil

and some scratch paper." Carbone instructed Kammerer to pay Murray for the use of the telephone—$150 for the first week, and thereafter $300 on the first and fifteenth days of each month. Murray then went on his way. Carbone drove Kammerer to an automobile service station nearby and there he made a telephone call, after which he handed Kammerer a slip of paper bearing the number of the telephone in the defendant Franze's apartment in the building at 106 North Grove Street, in East Orange, provided him with "a scratch sheet, pencil and some scrap paper," and then drove him to the apartment house. Carbone entered the building, telling Kammerer to wait, and returned in a few minutes and supplied Kammerer with a key to the building's street entrance and a key to the Franze sixth-floor apartment; and thereupon they proceeded to the apartment, where Kammerer and Mrs. Franze were introduced, the former as "Jack" and the latter as "Laura." Carbone indicated to Kammerer the table, telephone and radio in the apartment to be used in the bookmaking venture; and he told Mrs. Franze to present her telephone bills to Kammerer for payment. Carbone departed and had no further contact with Kammerer. Thereafter, Kammerer was a daily occupant of the apartment (excluding Sundays) from 11:30 A. M. to 5:30 P. M., receiving bets over the telephone from Kalik's customers, a list of whom was supplied by Kalik each morning before Kammerer left New York City for East Orange, and was returned by Kammerer with bets recorded to a man known as "Charlie" upon his return to New York City in the evening. "Charlie" provided him with the money to pay the telephone bills incurred at the East Orange apartment.

The insistence is that since Kammerer "was not charged in the indictment either as a defendant" or as "a conspirator with any of the defendants," evidence of his "operations" and "conversations" in furtherance of the conspiracy was not admissible against the defendants Carbone and Franze, unless the occurrences were in their presence; and, moreover, that since "the evidence clearly showed that Kammerer was

a party to·a conspiracy together with" Kalik and one Katz "to make book," and neither "Murray," Carbone nor Franze "had any interest whatsoever in that conspiracy," Kammerer's "acts in the apartment and in New York were performed on behalf of Kalik and Katz," and so Kammerer "was not acting as agent of either of the defendants, and the evidence was not admissible on the theory of agency." The argument proceeds on the hypotheses that neither Carbone nor Franze had "a stake in the venture which Kammerer was conducting for Kalik and Katz"; that Carbone's "only act ·was obtaining a phone at a price payable to Murray and not to him"; that Franze was not shown to have had "any knowledge, at the inception, of Kammerer's intentions," and she "was convicted because she did not put an end to Kammerer's activities"; that there was no evidence that "the taking of bets and the receipt and payment of money" were in furtherance of a conspiracy between Kammerer and the defendants; and that, on the contrary, Kammerer's "acts were pursuant to an agreement he had made with Kalik and Katz," and "not having been named as a conspirator in the indictment, his acts were not binding on defendants." It is suggested that the grand jury "by its indictment found that Kammerer was not a co-conspirator with those charged in the indictment .with conspiracy." The case of *State v. Rappise,* 3 *N. J. Super.* 30 (*App. Div.* 1949), is cited in support of the point.

But the doctrine implicit in this reasoning is not countenanced by the common law; and the rule of the common law has not been modified in New Jersey.

At common law, a conspiracy consists not merely in the intention but in the agreement of two or more persons (not being husband and wife) to do an unlawful act, or to do a lawful act by unlawful means. So long as such a design rests in intention only, it is not indictable. When two agree to carry it into effect, the very plot is an act in itself, and the act of each of the parties, promise against promise, *actus contra actum,* capable of being enforced if lawful, punishable

if for a criminal object or for the use of criminal means. The agreement is an advancement of the intention which each has conceived in his mind; the mind proceeds from a secret intention to the overt act of mutual consultation and agreement. *Mulcahy v. R., L. R.* 3 *H. L.* 306, 317 (1868) per Willes, J.; *Quinn v. Leathem,* [1901] *A. C.* 495, 529. *Vide R. v. Brailsford,* [1905] 2 *K. B.* 730, 746; *R. v. Thorp,* 5 *Mod.* 221; *Comb.* 458; *R. v. Plummer,* [1902] 2 *K. B.* 339, 71 *L. J. K. B.* 805; 20 *Cox* 269; 66 *J. P.* 647; *R. v. Meyrick and Ribuffi,* 21 *Cr. App. R.* 94 (1929); 1 *Hawk., c.* 72, § 8. It is not requisite, in order to constitute a conspiracy at common law, that the acts agreed to be done be such as would be criminal if done; it is enough if the acts agreed to be done, although not criminal, be wrongful, *i. e.,* amount to a civil wrong. *R. v. Warburton, L. R.* 1 *CCR.* 274; 40 *L. J. M. C.* 22; 10 *Cox* 584; *R. v. Whittaker,* [1914] 3 *K. B.* 1283, 84 *L. J. K.·B.* 225; 24 *Cox* 272; 79 *J. P.* 28; *R. v. Rowlands,* 17 *Q. B.* 671. The gist of the offense of conspiracy lies, not in doing the act, nor effecting the purpose for which the conspiracy is formed, nor in attempting to do them, nor in inciting others to do them, but in the forming of the scheme or agreement between the parties. 1 *East P. C.* 462. The offense depends on the unlawful agreement and not on the act which follows it; the latter is not evidence of the former. 2 *Burr.* 993; 3 *Burr.* 1321. The combination itself is vicious and gives the public an interest to interfere by indictment. *Mogul S. S. Co. v. McGregor,* 21 *Q. B. D.* 544 (1888). *Vide United States v. Rabinowich,* 238 *U. S.* 78, 35 *S. Ct.* 682, 59 *L. Ed.* 1211 (1915). The external or overt act of the crime is concert by which initial consent to a common purpose is exchanged. *R. v. Plummer,* [1902] 2 *K. B.* 339, 449. *Vide Mulcahy v. R.,* cited *supra,* Lord Chelmsford. In order to render one criminally liable for conspiracy at common law, it must be shown that he entered into an agreement as thus defined with one or more persons, whether charged with him in the

indictment or not, and whether known or unknown: 1 *Hawk.*, c. 72, § 8; 3 *Chitty, Cr. L.* 1141.

But it is not essential that there be direct contact between the parties, or that all enter into the conspiratorial agreement at one and the same time. "It may be that the alleged conspirators have never seen each other, and have never corresponded. One may have never heard the name of the other, and yet by the law they may be parties to the same common criminal agreement." *R. v. Parnell,* 14 *Cox Cr. Cases,* 508, at *p.* 515 (1881), per Fitzgerald, J., cited with approval in *R. v. Meyrick and Ribuffi,* 21 *Cr. App. R.,* at *p.* 99 (1929). "What has to be ascertained is always the same matter: is it true to say, * * * that the acts of the accused were done in pursuance of a criminal purpose held in common between them.?" *Id.* per Hewart, L. C. J., at *p.* 102. One who joins a conspiracy after its formation is equally guilty with the original conspirators. *R. v. Murphy,* 8 *C. & P.,* at *p.* 311; *State v. Lennon,* 3 *N. J.* 337 (1949). See also, *Kelley v. State,* 210 *Ind.* 380, 3 *N. E.* (2) 65 (*Sup. Ct.* 1936).

In New Jersey, an agreement or combination between two or more persons to commit a crime constitutes a conspiracy punishable as a misdemeanor, if with certain exceptions there be an overt act in furtherance of the object of the agreement by one or more of the parties. *R. S.* 2:119–1, 2, *N. J. S. A.* The union is invested with a potentiality for evil that renders the plan criminal in itself, and punishable as such if an act be done to effect its object. *State v. Lennon,* cited *supra.*

It is a corollary of these common-law principles that the acts and declarations of any of the conspirators in furtherance of the common design may be given in evidence against any other conspirator. And the rule is applicable where it is charged that a crime was committed in pursuance of a conspiracy, whether or no the indictment contains a count for conspiracy. *R. v. Duffield,* 5 *Cox* 404 (1851); *R. v. Desmond,* 11 *Cox* 146 (1868); *R. v. Jessop,* 16 *Cox*

204 (1877); *R. v. Charles,* 17 *Cox* 499 (1892); 1 *Hawk., c.* 72, § 8; 3 *Chitty Cr. L.* 1141. The principle has general acceptance in this country. Evidence of a conspiracy between two or more defendants to commit the crime for which they were jointly indicted is admissible against any of them, even though there be no charge of conspiracy in the indictment. *Goins v. State,* 46 *Ohio St.* 457, 21 *N. E.* 476 (*Sup. Ct.* 1889); *People v. McKane,* 143 *N. Y.* 455, 38 *N. E.* 950 (*Ct. App.* 1894); *State v. Ruck,* 194 *Mo.* 416, 92 *S. W.* 706 (*Sup. Ct.* 1905); *State v. Browning,* 153 *Iowa* 37, 133 *N. W.* 330 (*Sup. Ct.* 1911); *Day v. Commonwealth,* 173 *Ky.* 269, 191 *S. W.* 105 (*Ct. App.* 1917). See also, 66 *A. L. R.* 1311. Overt acts proved against one or more of the prisoners may be looked to as against all of them, to show the nature and object of the conspiracy. *R. v. Esdaile and Brown,* 8 *Cox* 69 (1857); *State v. Greenberg,* 105 *N. J. L.* 383 (*E. & A.* 1929).

Where two or more persons have entered into a conspiracy to perpetrate a crime, the acts and declarations of one of the conspirators in furtherance of the common object are deemed in law the acts and declarations of all. This on the theory of a joint or mutual agency *ad hoc* for the prosecution of the common plan. *R. v. Lord Lovatt,* 18 *S. Tr.* 529; *R. v. Shellard,* 9 *C. & P.* 277; 4 *St. Tr.* (*n. s.*) 1386; *R. v. Blake,* 6 *Q. B.* 126; 13 *L. J. M. C.* 131. This is the rule in New Jersey; and it is the general rule. *State v. Dougherty,* 86 *N. J. L.* 525 (*Sup. Ct.* 1915); *State v. Herbert,* 92 *N. J. L.* 341 (*Sup. Ct.* 1918); *State v. Greenberg,* 105 *N. J. L.* 383 (*E. & A.* 1929); *State v. Neary,* 106 *N. J. L.* 104 (*E. & A.* 1930); *State v. Seidman,* 107 *N. J. L.* 204 (*Sup. Ct.* 1931), affirmed *State v. Fischman,* 108 *N. J. L.* 550 (*E. & A.* 1931); *State v. Simon,* 113 *N. J. L.* 521 (*Sup. Ct.* 1934); *Logan v. United States,* 144 *U. S.* 263, 12 *S. Ct.* 617, 36 *L. Ed.* 429 (1892); *Gerson v. United States,* 25 *Fed. 2d* 49 (*C. C. A.* 8 1928); *Commonwealth v. Brown,* 14 *Gray* 419 (*Sup. Jud. Ct. Mass.* 1860); *State v. Pike,* 51 *N. H.* 105 (*Sup. Jud. Ct.* 1871); *Commonwealth*

v. *Farmer,* 218 *Mass.* 507, 106 *N. E.* 150 (*Sup. Jud. Ct.* 1914); *Commonwealth v. McManus,* 282 *Pa.* 25, 127 *A.* 316 (*Sup. Ct.* 1925); *People v. Connolly,* 253 *N. Y.* 330, 171 *N. E.* 393 (*Ct. App.* 1930); *People v. Touhy,* 361 *Ill.* 332, 197 *N. E.* 849 (*Sup. Ct.* 1935); *Kelley v. State,* cited *supra; Wharton's Criminal Evidence* (11*th* ed.), *sec.* 699 *et seq.* The acts and declarations of an agent, within the scope of his authority, are considered and treated as the acts and declarations of his principal. "What is so done by an agent, is done by the principal through him, as his mere instrument." *Franklin Bank of Baltimore v. Pennsylvania D. & M. Steam Navigation Co.,* 11 *G. & J.* 28, 33 (1839). "If the conspiracy be proved to have existed, or rather if evidence be given to the jury of its existence, the acts of one in furtherance of the common design are the acts of all; and whatever one does in furtherance of the common design, he does as the agent of the co-conspirators." *R. v. O'Connell,* 5 *St. Tr.* (*n. s.*) 1, 710.

 Generally, the rules of evidence are no different in criminal cases; the admissions of an agent are receivable in a criminal charge against the principal. A conspiracy makes each conspirator liable under the criminal law for the acts of every other conspirator done in pursuance of the conspiracy. The admissions of a co-conspirator may be used "to affect the proof against the others, on the same conditions as his acts when used to create their legal liability. The tests \* \* \* are the same, whether that which is offered is the act or the admission of the co-conspirator." *Wigmore on Evidence* (3*rd.* ed.), *section* 1079. A conspiracy is a partnership in crime. *United States v. Socony Vacuum Oil Co.,* 310 *U. S.* 150, 253, 60 *S. Ct.* 811, 84 *L. Ed.* 1129, 1183 (1940). The least degree of concert of action suffices to render the act of one conspirator the act of all. But it is requisite that there be confederacy in fact and that the act be done in the execution of the conspiratorial project. Acts foreign to the common design are not within the principle. *People v. Ryan,* 263 *N. Y.* 298, 189 *N. E.* 225 (*Ct. App.*

1934) ; *People v. Payne,* 359 *Ill.* 246, 194 *N. E.* 539 (*Sup. Ct.* 1935). The declarations of a conspirator constitute an exception to the hearsay rule, affording in the circumstances a sufficient guaranty of testimonial trustworthiness.

Here, participation in the conspiracy was laid to Kammerer by the overt acts charged in the indictment, although this is not to suggest that the application of the principle is varied by the absence of this circumstance. In the case of *The King v. William Stone,* 6 *Durnford & East's Reports* 527 (1796), the prisoner was indicted for high treason, for compassing the death of the king and adhering to his enemies. The overt acts charged were 11 in number; but that to which the evidence chiefly applied was the conspiring with John Hurford Stone, William Jackson and others unknown to collect intelligence of the disposition of the king's subjects in case of an invasion of Great Britain or Ireland, and to communicate such intelligence to the enemies of the king. Neither John Hurford Stone nor Jackson was indicted. A letter containing treasonable information dispatched by Jackson with a view of reaching the enemy, in pursuance of the common design, was received in evidence against all engaged in the conspiracy. Grose, J. said: "If a number of persons meet towards one common end, the act of each is evidence against all concerned." And Lawrence, J., added that "evidence having been given sufficient for the jury to consider whether the prisoner was not one engaged in a conspiracy for treasonable purposes with Jackson, if they were of that opinion, Jackson's acts done in pursuance of that conspiracy were in contemplation of law the acts of the prisoner."

▮▮▮▮ The convictions of both defendants are well grounded in the evidence. A conspiracy may be proved by direct evidence, or by circumstances from which the jury may presume it. *R. v. Parsons,* 1 *W. Bl.* 392; *R. v. Murphy,* 8 *C. & P.* 297. Proof of the existence of a conspiracy is generally a "matter of inference deduced from certain criminal acts of the parties accused, done in pursuance of an apparent criminal purpose in common between them." *R. v. Brissac,*

342

4 *East* 164, 171, Grose J. Though the act of conspiracy is the gist of the offense, "it is not necessary to show an actual association or confederacy, but it may be left to reasonable inference." *Chitty, Cr. L.,* 1141. There is an amplitude of proof of concert of action directed to the furtherance of the common plan charged in the indictment. The inference of guilt is inescapable.

We find no merit in the assignment of error on the supplemental instruction given the jury relating to the circumstances that would make the defendant Franze a knowing participant in the conspiracy alleged in the indictment. We concur in the disposition of the point made by the Appellate Division.

Judgment affirmed.

*For affirmance*—Chief Justice VANDERBILT, and Justices HEHER, OLIPHANT, BURLING and BRENNAN—5.

*For reversal*—Justice WACHENFELD—1.